# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 10-CR-470 (JFB)
_____

UNITED STATES OF AMERICA,

VERSUS

JUVENILE MALE #2,

Defendant.

_____

MEMORANDUM AND ORDER
January 26, 2011

_____

JOSEPH F. BIANCO, District Judge:

On June 14, 2010, the government filed a Juvenile Information ("Information") against defendant Juvenile Male #2 ("the defendant") charging him with one count of conspiracy to commit murder in aid of racketeering, 18 U.S.C. § 1959(a)(5); two counts of murder in aid of racketeering, 18 U.S.C. § 1959(a)(1); two counts of discharging a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii); and two counts of causing the death of another through the use of a firearm, 18 U.S.C. § 924(j)(1).[1] The government subsequently

moved, pursuant to 18 U.S.C. § 5032, to transfer the case to district court in order to prosecute the defendant as an adult. On December 21, 2010, after written submissions had been filed with the Court, the Court conducted an evidentiary hearing on the government's transfer motion.[2] The Court also has received and considered the written submissions filed by both the government and the defendant after the hearing. This Memorandum and Order

_____

[1] The government charged one of the defendant's alleged co-conspirators, Adalberto Guzman, in a Juvenile Information filed on May 21, 2010 in connection with the crimes alleged in this case. *See United States v. Guzman*, 10-cr-421 (JFB). By Memorandum and Order dated December 14, 2010, the Court transferred Guzman to district court for prosecution as an adult. *See United States v. Juvenile Male*, No. 10-cr-421, --- F. Supp. 2d ----, 2010 WL

_____

5079457 (E.D.N.Y. Dec. 14, 2010). The Court unsealed the docket in *Guzman* by Order dated January 19, 2011.

[2] Section 5038(e) of the Juvenile Justice and Delinquency Prevention Act provides that neither the name nor the picture of any juvenile shall be made public during juvenile delinquency proceedings. The Court determined that, in order to comply with this provision and the other statutory provisions of § 5038 that require the confidentiality of juvenile records, the proceedings and all documents related to the Juvenile Information should be sealed.

contains the Court's findings pursuant to 18 U.S.C. § 5032.

For the reasons set forth herein, the government's motion to transfer to adult status is granted. In particular, the legal framework established by Congress in the Juvenile Justice and Delinquency Prevention Act recognizes that, under certain circumstances, the rehabilitative focus of the juvenile justice system must yield to the compelling need to protect the public from the dangerous threat to society posed by the alleged criminal activity of a juvenile, thus warranting transfer of that juvenile to adult status. This case is precisely such a situation. After conducting a hearing and carefully considering the statutory factors, this Court concludes in its discretion that the transfer of this juvenile to the district court to face prosecution as an adult, for his alleged participation in the gang-related, execution-style murder of a woman and her two-year old son, is in the interest of justice. The statutory factors in favor of transfer are extremely strong in this case. As an initial matter, as noted in the Court's prior decision transferring another juvenile charged with the same crimes to adult status, the nature of the alleged offense—namely, the defendant's alleged participation, as part of the racketeering activities of the MS-13 gang, in this heinous, double homicide in the woods of Central Islip—overwhelmingly favors transfer to adult status in the interest of justice. Defense counsel correctly notes that the fact that a defendant is charged with the grave crime of murder does not automatically warrant transfer to adult status in this case; rather, that factor, although entitled to special weight in this case, must be considered and balanced by the Court under the law in conjunction with the other statutory factors. However, as discussed in great detail below, the other factors on balance also strongly favor transfer in this case. First, the defendant was sixteen years, eight months old at the time of the alleged crime and was seventeen years, six months old at the time of the transfer hearing. Moreover, the defendant's social background has been characterized by a long-time affiliation with the violent MS-13 gang since the age of thirteen, and by the complete absence of any stable family or social support structure. In fact, his long-standing alliance and identification with the gang is so embedded in the personality of this defendant that he tattooed "MS" in large letters on his chin after he was placed in jail in connection with the current charges, and he continues to fight with rival gang members during his incarceration. Thus, the factor regarding the defendant's age and social background favors transfer. Second, with respect to the nature and extent of the defendant's prior delinquency record—namely, (1) a juvenile, misdemeanor conviction in or about 2008 in connection with a robbery and assault, and (2) a conviction in 2009 in connection with the carrying of a twenty-four inch machete in his hand, running toward a group of students who were fighting—strongly favor transfer. Third, with respect to the statutory factor regarding past treatment efforts, the evidence is clear that the leniency shown by the courts in connection with these other juvenile crimes, and the rehabilitation efforts made during the defendant's prior periods of incarceration, have been completely ineffective. For example, the defendant has responded to past treatment efforts while incarcerated by telling one teacher "something bad is going to happen to you," and, in a separate incident, threatening to return to the facility and blow it up. (Gov't Ex. 8 at 98, 121.) Thus, this factor strongly favors transfer and, along with these other factors, provides clear and unequivocal support for concluding that efforts to rehabilitate this defendant as a juvenile, if he

were convicted, would be futile. In fact, when this Court expressed concern at the evidentiary hearing to the defendant's expert neuropsychologist about the defendant's ability to be rehabilitated by age twenty-one if convicted of the charged crimes as a juvenile (which would be the maximum end date for any sentence that could be imposed by this Court on him as a juvenile), the expert candidly agreed that the Court's "concern is warranted." (Tr.[3] at 133:13-20.) With respect to the remaining two factors, the Court finds that the defendant's present psychological maturity and intellectual development is a neutral factor, and that the availability of programs to treat juvenile behavior problems weighs against transfer. However, these last two factors together do not come remotely close to outweighing the other statutory factors which, in combination, overwhelmingly and conclusively favor transfer. In short, after considering and weighing all of the statutory factors, as discussed in detail below, the Court concludes in its discretion that the government has met its burden of proving by a preponderance of the evidence that the interest of justice would be served by transferring the defendant to the district court for prosecution as an adult in this case.

---

[3] "Tr." refers to the transcript of the December 21, 2010 transfer hearing.

## I. THE CHARGES[4]

The charges against the defendant stem from the government's continuing investigation into the activities of the violent street gang La Mara Salvatrucha ("MS-13"). (Gov't Mem. of Law at 2.) Since approximately 1998, members of MS-13 on Long Island are alleged to have engaged in street wars with rival gangs that have resulted in the murder, shooting, and assault of MS-13 and rival gang members, as well as their families and innocent bystanders. (*Id.* at 2-3.) Twenty-two defendants allegedly associated with MS-13 have been charged with various crimes in a 42-count superseding indictment unsealed on July 30, 2010 in *United States v. Prado*, No. 10-cr-074 (JFB).

As set forth in the government's transfer motion, the defendant has been charged in connection with the murder of nineteen-year-old "V.A." and her two-year-old son, "D.T."[5] According to the allegations in the

---

[4] The allegations set forth herein were drawn from the information presented at the December 21, 2010 hearing and from the government's motion papers and supporting documentation. The Second Circuit has made clear that, on a transfer motion, a district court should not undertake an examination of the strength of the government's evidence, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *United States v. Nelson*, 68 F.3d 583, 589 (2d Cir. 1995). Accordingly, the Court merely sets forth the allegations and the nature of the offense as they are alleged by the government and takes no position as to the relative strength of the evidence supporting those allegations.

[5] Although the government states that D.T. was two years old, the autopsy report states that D.T.'s given age was fourteen months. (*See*

3

government's submissions, in early 2010, V.A., who had ties to the 18th Street Gang and the Latin Kings, both rival gangs of MS-13, became involved in a romantic relationship with an unnamed MS-13 member (referred to in the government's papers as "CC-1"). (*Id.* at 6.) After a dispute between V.A. and CC-1, V.A. gave CC-1's address to members of the 18th Street Gang, who thereafter went to CC-1's house on two occasions for the purpose of attacking him. (*Id.*) When CC-1 explained to the defendant and a second co-conspirator ("CC-2"), also a member of MS-13, that he had been threatened by members of the 18th Street Gang as a result of the information provided by V.A., CC-1, CC-2, and the defendant discussed, in sum and substance, that they had to retaliate against V.A. (*Id.* at 6-7.)

On February 4, 2010, CC-1 arranged to meet with V.A. and drove with CC-2 and the defendant to pick her up. (*Id.* at 7.) V.A. was accompanied by her two-year-old son, D.T. (*Id.*) After obtaining a handgun from another MS-13 member, CC-1, CC-2, and the defendant drove V.A. and D.T. to Central Islip, New York, where the defendant and his co-conspirators lured V.A. and her son into a wooded area. (*Id.*) Once they were in the woods, the defendant, CC-1, and CC-2 shot V.A. and D.T. (*Id.*) V.A. was shot once in the head and once in the chest, and her son was shot twice in the head. (*Id.*)

After the murders, in February 2010, the defendant, CC-1, and CC-2 fled from the United States to El Salvador. (*Id.* at 7.) On April 23, 2010, the government obtained an arrest warrant for the defendant and began preparing the paperwork necessary to have

the defendant extradited from El Salvador. (*Id.* at 8.) Before that process was completed, however, on May 4, 2010, the defendant reentered the United States through John F. Kennedy International Airport and was arrested later that day in Central Islip, New York. (*Id.*)[6]

## II. LEGAL STANDARD FOR DISCRETIONARY TRANSFER

"A juvenile fifteen years of age or older who is 'alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence' may be proceeded against as an adult where a district court, after a transfer motion by the Attorney General, finds that it is 'in the interest of justice' to grant a transfer." *United States v. Nelson*, 68 F.3d 583, 588 (2d Cir. 1995) ("*Nelson I*") (quoting 18 U.S.C. § 5032).[7] In evaluating whether a

---

[6] The government also provided information based upon the defendant's inculpatory post-arrest statements. (*See* Gov't Mem. of Law at 8-10.) Although the defendant has not formally moved to suppress the statements, he does dispute their voluntariness. (*See* Def.'s Mem. of Law at 2-3.) However, the Court need not address the question of voluntariness because the Court does not intend to rely upon the defendant's statements in any way in connection with this motion. In other words, even without the defendant's statements, the Court finds, for the reasons set forth herein, that the government has clearly met its burden in demonstrating that transfer is appropriate in this case.

[7] In addition, § 5032 provides, in relevant part, that no juvenile shall be prosecuted "in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that . . . the offense charged is a crime of violence that is a felony . . . and that there is a substantial Federal interest in the case or the offense to warrant the

---

Gov't Ex. 10.) This distinction is immaterial to the Court's legal analysis.

transfer to adult status would be "in the interest of justice," a district court must consider the following six factors and make findings on the record as to each: (1) the juvenile's age and social background; (2) the nature of the offense alleged; (3) the nature and extent of any prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavior problems. *See* 18 U.S.C. § 5032; *Nelson I*, 68 F.3d at 588. Given the presumption that exists in favor of juvenile adjudication, the burden is on the government to establish by a preponderance of the evidence that transfer is warranted. *See Nelson I*, 68 F.3d at 588; *United States v. John Doe #3*, 113 F. Supp. 2d 604, 605 (S.D.N.Y. 2000).

Although the Court must evaluate each of the six factors outlined in § 5032, it need not afford each of these factors equal weight, and instead "may balance the factors in any way that seems appropriate to it." *Nelson I*, 68 F.3d at 588. In particular, the Second Circuit has explained that "when a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors." *Id.* at 590. This is particularly true when the case involves "[t]he heinous nature

of the crime of intentional murder," which "certainly may be a factor entitled to special weight." *Id.* Furthermore, the defendant's potential for rehabilitation typically should also be given "special emphasis." *United States v. Ramirez*, 297 F.3d 185, 193 (2d Cir. 2002). Indeed, the notion of rehabilitation "permeat[es] the transfer decision . . . [and] clearly is one of the primary purposes of the juvenile delinquency provisions." *United States v. Nelson*, 90 F.3d 636, 640 (2d Cir. 1996) ("*Nelson II*") (internal quotation marks and citation omitted). Nevertheless, even though a juvenile's potential for rehabilitation is a "crucial determinant in the transfer decision," this factor "must be balanced against the threat to society posed by juvenile crime." *Id.* (internal quotation marks and citations omitted). Accordingly, it is not sufficient for a court to find that there is merely a "glimmer of hope" for a juvenile's future treatment prospects. *Nelson I*, 68 F.3d at 590. Instead, a court must determine that the juvenile is "likely to respond to rehabilitative efforts," which is a standard that "strikes the appropriate balance [between] . . . . affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)." *Nelson II*, 90 F.3d at 640 (citations and alterations omitted).[8]

exercise of Federal jurisdiction." 18 U.S.C. § 5032. The parties do not dispute that the government in this case has submitted an appropriate certification from the United States Attorney for the Eastern District of New York, certifying that the offenses charged in this case "are crimes of violence that are felonies" and that "there is a substantial federal interest in the case and the offenses to warrant the exercise of federal jurisdiction." (Gov't Mem. of Law Ex. 3.)

[8] Section 5032 of the Juvenile Justice and Delinquency Prevention Act also provides for the mandatory transfer of juveniles to adult status for purposes of prosecution where: (1) a juvenile, after his sixteenth birthday, allegedly commits an offense that would be a felony if committed by an adult; (2) the offense involved the use, attempted use, or threatened use of

### III. ANALYSIS OF FACTORS

#### A. Juvenile's Age and Social Background

The Second Circuit has instructed that a district court should consider a juvenile defendant's age not only at the time of the offense, but also at the time of the transfer hearing. *See Nelson I*, 68 F.3d at 589 (finding that district court erred in refusing to consider juvenile's age at the time of the transfer hearing and noting that "unless the government intentionally delays the filing of juvenile charges, there is every reason to give weight also to the age at the time of the transfer motion. The statutory factor specifies only 'age,' and certainly, current age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application."). The closer the juvenile is to the age of majority, the more this factor weighs in favor of transfer. *See United States v. Juvenile Male*, 554 F.3d 456, 468-69 (4th Cir. 2009) ("A juvenile's age toward the higher end of the spectrum (eighteen), or the lower end (fifteen), is to be weighed either for or against transfer. Here, we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer.").

_____

physical force, or, by its very nature, involved a substantial risk that physical force would be used in committing the offense; and (3) the juvenile "has previously been found guilty of an act which if committed by an adult would have been" one of the enumerated offenses supporting discretionary transfer. *See* 18 U.S.C. § 5032; *United States v. Juvenile Male #1*, 47 F.3d 68, 69 (2d Cir. 1995). In this case, however, the government does not contend that mandatory transfer is warranted. Accordingly, the Court need only analyze whether transfer is appropriate under the discretionary standard outlined *supra*.

In this case, the defendant, born on June 2, 1993 (Gov't Ex.[9] 2, 8), was sixteen years, eight months old at the time of the alleged murders and seventeen years, six months old at the time of the hearing. The Court finds that the defendant's current age of nearly eighteen, which would allow him only three years in a juvenile detention facility to rehabilitate himself, and the fact that he was nearly seventeen years old, and therefore was not a young child, at the time of the alleged murders, both weigh in favor of transfer. *See Nelson I*, 68 F.3d at 589 ("[T]he more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks and citation omitted)); *United States v. Doe*, 49 F.3d 859, 867 (2d Cir. 1995) (finding that district court did not abuse its discretion in concluding that age favored transfer where juvenile committed robbery at age 16½ and extortion at age 17, and explaining that "because Doe had continued to engage in acts involving [his gang] up to just a year short of his eighteenth birthday, the conduct with which he was charged did not occur either when he was very young or as an isolated indiscretion").

The Court also finds that the defendant's social background weighs in favor of transfer. According to the information self-reported by the defendant and his parents to Dr. Angela M. Hegarty ("Dr. Hegarty"), who testified on the defendant's behalf, the defendant was born into an impoverished home in El Salvador, where he lived until he was seven years old. (Tr. at 66-69.) When the defendant was approximately nine months old, his mother came to the United States, leaving the defendant to be raised by his maternal grandmother. (*Id.* at 66:18-22.)

_____

[9] "Gov't Ex." refers to the government's exhibits that were admitted into evidence at the December 21, 2010 transfer hearing.

The defendant grew extremely attached to his grandmother who assumed the role of mother in the defendant's life. (*Id.* at 66:22-24; Report of Forensic Assessment by Dr. Angela Hegarty ("Hegarty Report") at 6.) At some point during the defendant's childhood, he became attached to an uncle who had arrived from the United States and who apparently had a negative influence on the defendant. (Tr. at 67-68.) In particular, the uncle gave the defendant drugs and alcohol, encouraged the defendant to steal from his family members, and, on one occasion, tried to attack the defendant's grandmother with a machete. (*Id.* at 67:15-68:6; Hegarty Report at 6; Forensic Neuropsychological Report by Dr. William Barr ("Barr Report") at 2.) Ultimately, when the defendant was seven years old, and after he began to increasingly misbehave under the negative influence of his uncle, the family decided to send the defendant to the United States. (Tr. at 69:6-15.) After being smuggled into the country in or about December 2000, the defendant went first to an uncle's house in Los Angeles. (*Id.* at 69:14-17.) The defendant's stepfather then came to retrieve him and brought him to Brentwood, New York in the winter of 2000-2001. (*Id.* at 69:20-22; Hegarty Report at 6.)

As described by Dr. Hegarty, the defendant witnessed domestic violence and was the victim of physical abuse in his new home. (Hegarty Report at 6.) The defendant's mother "did whatever her husband demanded of her," and, consequently, would sometimes punish the defendant merely because the defendant's stepfather thought she should. (*Id.*; *see also id.* at 12; Tr. at 70:1-3.) The defendant was subjected to different rules than the other children in the household and was forbidden, as per his stepfather's orders,

from seeing his biological father. (Tr. at 70:4-18; Hegarty Report at 6.)

Despite these difficult circumstances, the defendant, who spoke no English when he arrived here, managed to learn English and do reasonably well in school. (Tr. at 70:7-9.) However, while his academic performance in school was good, the defendant began having increasing behavioral problems (even after his mother left her abusive husband), and when he was twelve or thirteen years old, he joined MS-13. (*Id.* at 70:19-71:5; Barr Report at 3.) After joining the gang, the defendant's behavioral problems at school continued, and he was suspended in 2006 and 2007 for several gang-related incidents, including "throwing up gang signs," threatening other students, and attempting to initiate fights. (*See* Gov't Ex. 17 at 41, 44, 46.) The defendant admitted to Dr. Barr that he and his gang were "involved in a number of illegal activities including drugs, prostitution, and extortion." (Barr Report at 3.) Eventually, as described in greater detail *infra*, the defendant's behavior led to his arrest and conviction both for robbery and assault and for possession of a machete and, beginning in 2008, he was in-and-out of juvenile detention facilities until his alleged involvement in the murders in this case.

The Court concludes that, under the circumstances of this case, the defendant's social background weighs in favor of transfer. Specifically, the Court finds that defendant's chaotic and unstable home life, along with his long-time affiliation with MS-13 since the young age of thirteen, present exactly the type of unstable environment and social surroundings that will make it highly unlikely that defendant can rehabilitate himself and avoid criminal behavior. For example, Dr. Hegarty repeatedly indicated, in both her report and

her testimony, that successful rehabilitation for the defendant would hinge upon "treatment . . . in a structured setting in an environment that is *not* dominated by gangs" and where the defendant had a "long term stable relationship with a mature male role model." (Hegarty Report at 5; *see also* Tr. at 74:23-75:2 (noting that three key factors for defendant's rehabilitation would be staying away from gangs, having a male role model that he could have a relationship with over time, and sustained, consistent treatment); *id.* at 82:11-24 ("[I]f we change the environment, if we change what has been done to this young man, the outcome could be otherwise than what we might expect. . . . The prior instances essentially reveal that when he's in the wrong company, he does the wrong things. He follows the hierarchical [chain] of command. He does what is expected of him when he's in a gang."); *id.* at 90:16-19 ("[I]n a structured setting, removed from a gang, with appropriate treatment over time, this defendant would do well.").) However, the description of the defendant's background provided *supra* clearly shows that the defendant's life has been, and continues to be, devoid of any such role models who could positively influence his life. Indeed, the record reflects that even when the adults in the defendant's life have tried to help the defendant or provide him with positive opportunities, they were not able to exert any control over his behavior. By way of example, when the defendant was released from juvenile detention in December 2009, he went to live with his father, who brought the defendant to work with him. (Hegarty Report at 2-3.) However, the defendant allegedly was involved in the murders of V.A. and D.T. only a mere six weeks after his release. The defendant also was living with his father at the time of his earlier arrest for possession of a weapon. (*Id.* at 12 ("After [the defendant] was released from

[his first incarceration] he moved in to live with his father. For a while things went well. He liked hanging out with his father. [His father] recalls the good times he had with his son. He was going to school. He listened to what his father had to say. But then he got into trouble again. All of a sudden he seemed to change. He was arrested again. This is the second time he was sent away.").) Furthermore, even after his mother left her abusive marriage and the defendant no longer was exposed to his stepfather, he nevertheless rejected his biological family and opted to join MS-13. Significantly, the defendant freely admits that he is a member of MS-13 and also apparently admits that his fellow members of the gang have become, in essence, a substitute family for him. (*Id.* at 14 (explaining that the defendant is "open about his membership in the MS-13 gang" and that although the defendant's mother told him that "his friends are not his family . . . to the defendant, this seems to be what the gang had become"); *see also* Def.'s Closing Argument at 3 ("Eventually his mother remarried but circumstances for [the defendant] did not improve. He became involved in a group of Hispanic boys in school who became his surrogate family. This association eventually led to difficulty at school and he ended up being sent to a juvenile facility.").)

Of further concern to the Court is Dr. Hegarty's ominous warning that "[i]f [the defendant] remains identified with the gang, then the dots tattooed on his wrist when he was 13 will indeed predict his future." (Hegarty Report at 5.) As noted by Dr. Hegarty, "[t]he three dots stand for the 3 ways [the defendant's] crazy life can end: in a hospital, in prison or in a morgue." (*Id.* at 15.) However, there is no indication that the defendant is ready and willing to give up his affiliation with MS-13 and with the gang

members whom he considers to be his family. To the contrary, the record reflects that the defendant's dedication to his membership in MS-13 remains as strong as ever. Not only does the defendant willingly admit that he is a member of MS-13, but he also tattooed "MS" in large letters on his chin after he was arrested in this case and while he was incarcerated on the charges pending here. (*See* Gov't Ex. 1C; Hegarty Report at 14.) The defendant's decision to brand his face with the letters of his gang undeniably demonstrates that he remains committed to his gang membership, as does the fact that he continues to fight with rival gang members during his incarceration. (*See* Gov't Ex. 7C (containing the defendant's admission that he hit another inmate because "[h]e is Latin King and I am MS").) In sum, although the defendant has experienced repeated instances of instability and disruptions in his family life, a review of the record reveals that, unfortunately, the only constant feature in the defendant's life has been, and continues to be, his membership and involvement in MS-13.

Thus, given the defendant's continuing and long-term affiliation with his gang and the absence of any stable adult figures in his life who could possibly control his behavior, the Court finds that the defendant's social background makes it highly unlikely that he could be rehabilitated in the short period of time before he would have to be released from juvenile custody under federal law (*i.e.* by the age of twenty-one), if he were convicted of the crimes charged.[10]

Accordingly, both the defendant's age and social background weigh in favor of his transfer to adult status. *See United States v. Juvenile No. 1*, 118 F.3d 298, 308 (5th Cir. 1997) ("This evidence was certainly sufficient to support the district court's conclusion that '[i]t is probable that the absence of a strong family environment would make rehabilitation prospects for the juvenile unlikely.' According to the court, '[t]he family support necessary for [J.R.P.] to avoid future criminal activity is likely lacking. His mother and father have offered no guidance or support for him and his aunt has been unable to control his behavior although she has tried.' We note in addition that J.R.P.'s social background was not a significant factor in the court's overall decision to transfer; based on the evidence, the court concluded that J.R.P.'s social background 'could be considered neutral or favoring transfer.'"); *Doe*, 49 F.3d at 867 ("As to Doe's social background, the court noted that when Doe emigrated to the United States, his mother had stayed in Vietnam. Prior to the time of the offenses charged in the present prosecution, Doe's father had filed a petition in family court for judicial supervision of Doe. And by the time of the offenses charged in the present case, Doe was completely estranged from his father, preferring the violent BTK gang over his biological family. . . . [T]he court concluded that, '[o]n balance, in view of

_____

not extend (1) in the case of a juvenile who is less than eighteen years old, beyond the lesser of (A) the date when the juvenile becomes twenty-one years old; (B) the maximum of the guideline range . . . applicable to an otherwise similarly situated adult defendant unless the court finds an aggravating factor to warrant an upward departure from the otherwise applicable guideline range; or (C) the maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult.").

_____

[10] Because the defendant is currently under the age of eighteen, the maximum period of incarceration that he could receive for the crimes charged is until the age of twenty-one. *See* 18 U.S.C. § 5037(c)(1)(A)-(C) ("The term for which official detention may be ordered for a juvenile found to be a juvenile delinquent may

[Doe's] long association with the Born to Kill, it seems that the social background that he lived in at that time was one that would be a factor weighing in favor of a transfer.'"); *United States v. Anthony Y.*, 990 F. Supp. 1310, 1314-15 (D. New Mexico 1998) ("The social background of an unstable and unsupportive family environment, as exists here, favors transfer to adult status. It is difficult to reach the goal of the juvenile justice system to encourage treatment and rehabilitation without familial support. This conclusion is supported by the testimony of Dr. Roger Enfield, Anthony's expert. . . . [who] opined that one of the reasons juveniles become recidivists is because, while still young upon release from juvenile custody and treatment, they return to the same home environments in which they originally became law breakers." (internal quotation marks and citation omitted)), *aff'd* 172 F.3d 1249, 1254 (10th Cir. 1999) ("The [district] court found that Anthony Y.'s family background was 'unstable and unsupportive,' citing the testimony of Anthony's parents and school principal. It then weighed this factor in favor of transfer, noting Dr. Roger Enfield's opinion . . . . While the overall tenor of Dr. Enfield's testimony disfavored transfer, the district court could reasonably rely on that particular statement in finding that it would be more difficult to rehabilitate a child with an unsupportive family than a child with a stable, supportive one."); *United States v. H.V.T.*, No. 96-cr-244 (RSP/GJD), 1997 WL 610767, at *4 (N.D.N.Y. Oct. 1, 1997) ("[T]he defense's expert psychologist[] testified that H.V.T.'s separation from his mother at a young age, his lack of role models or attachment figures, and his older brother's death left H.V.T. highly vulnerable to being misdirected by others. . . . It appears that H.V.T. had a family structure available to him in his older brothers and aunts and uncles in the United States. Instead of taking advantage of the support that structure offered, H.V.T. quit school and left home. . . . It also appears that H.V.T. became a member of a gang. He wears a tattoo containing a dragon and the letters [of his gang]. . . . H.V.T. has been for some time completely estranged from his aunt in Florida who took him in following his prior conviction, and his brother indicates that he has had no contact with H.V.T. and would be unable to take care of him. I find that H.V.T.'s social background favors transfer.").

### B. Nature of the Offense Alleged

As an initial matter, as noted *supra*, a district court should not undertake an examination of the strength of the government's evidence in evaluating a transfer motion, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *Nelson I*, 68 F.3d at 589; *see also United States v. Doe #1*, 74 F. Supp. 2d 310, 317 n.6 (S.D.N.Y. 1999) ("For the purpose of a transfer determination, the court must assume that the juvenile committed the offenses charged in the indictment."). There is no question that the offenses charged in the Information are serious and extraordinarily heinous crimes. The defendant and his co-conspirators are alleged to have lured their victims—a 19-year-old woman and her two-year-old son—into an isolated, wooded area and then to have killed them both execution-style. As the Second Circuit has noted, "[t]he heinous nature of the crime of intentional murder certainly may be a factor entitled to special weight." *Nelson I*, 68 F.3d at 590. Moreover, these murders were allegedly committed as part of the defendant's participation in the violent racketeering activity of the MS-13 gang.

The Court finds not only that this factor weighs overwhelmingly in favor of transfer, but also that this factor should be afforded more weight than any of the other factors. *See id.* ("[W]hen a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors.")  The Court has no doubt that the murder of a mother and her young son constitutes the type of "particularly serious" crime that warrants weighing the nature of the offense more heavily than any of the other factors in the transfer analysis. Indeed, many other courts have weighed this factor more heavily than the others where the crimes charged were as serious—or even, in some cases, less serious—than the crimes alleged here. *See United States v. One Juvenile Male*, 40 F.3d 841, 846 (6th Cir. 1994) (district court did not abuse discretion in concluding that heinous nature of alleged offenses, which included several carjackings, during one of which an individual with the defendant shot and killed a car's passenger, "outweighed any factors that supported trying the defendant as a juvenile"); *United States v. A.R.*, 38 F.3d 699, 705 (3d Cir. 1994) ("The court made specific findings under each of the six statutory factors and explained how each weighed in the transfer decision.  A.R. attacks this weighing, suggesting that the court overemphasized the 'seriousness of the offense' factor.  Carjacking is a violent felony, however, and A.R. threatened his victims with a .25 caliber semi-automatic pistol.  The court was entitled to give more weight to this factor than to others, and generally to weigh the statutory factors as it deemed appropriate."); *United States v. Hemmer*, 729 F.2d 10, 18 (1st Cir. 1984) ("In light of the gravity of the crime involved [armed bank robbery and conspiracy to rob a national bank], weighed against the other five section 5032 factors, we cannot say that the district court struck

the balance improperly [in granting the government's transfer motion]."); *Doe #1*, 74 F. Supp. 2d at 321 (although majority of factors weighed against transfer, transfer nonetheless was warranted where the "defendant [was] charged with a host of serious crimes, including murder and other acts of violence," and the defendant also had a "demonstrated tendency to revert to criminal behavior"); *In re J. Anthony G.*, 690 F. Supp. 760, 766 (S.D. Ind. 1988) ("While all of the factors weigh very heavily, I feel that the seriousness of this offense is perhaps the most critical factor in this case.  While his family seems very supportive of him, Anthony has chosen to break away from his family and lead a life that is completely unknown to them.  Except for the fortuity of one of the four bullets striking the metal frame of the window, Anthony would have been accused not only of attempted robbery, but of murder.").[11]

---

[11] In his post-hearing submission, the defendant cited several cases where a juvenile defendant was charged with murder and with a crime that involved the death of another but where the government's motion to transfer the juvenile to adult status nonetheless was denied. (*See* Def.'s Closing Argument at 4 (citing *United States v. A.F.F.*, 144 F. Supp. 2d 797 (E.D. Mich. 2001); *United States v. Leon D.M.*, 953 F. Supp. 346 (D.N.M. 1996); *United States v. C.J.T.G.*, 913 F. Supp. 63 (D. Puerto Rico 1994); *United States v. M.L.*, 811 F. Supp. 491 (C.D. Cal. 1992)).)  As an initial matter, the Court notes that each of these cases are factually distinguishable from the defendant's case.  For example, in *Leon D.M.*, *C.J.T.G.*, and *M.L.* the defendants had not received any prior treatment and had either no, or very minor, delinquency records.  Likewise, the nature of the offense in *A.F.F.* is distinguishable from the offense alleged here— although both *A.F.F.* and the defendant here were charged with murder, the murder alleged in *A.F.F.* had no ties to any organized gang activity and instead was related to a child abuse incident

## C. Nature and Extent of Any Prior Delinquency Record[12]

that "was not motivated by personal gain, greed or avarice, but rather resulted from an apparent psychological reaction to circumstances with which the defendant could not cope." *A.F.F.*, 144 F. Supp. 2d at 803. The decision whether to transfer a juvenile to adult status is a fact-specific inquiry that is left to the sound discretion of the district court and is based upon a number of statutory factors and considerations, as discussed herein. Accordingly, the Court finds the cases cited by the defendant to be unpersuasive and finds, for the reasons discussed *supra*, that when the nature of the offense is analyzed and balanced in conjunction with the other statutory factors under the particular circumstances of *this* case, transfer to adult status is clearly warranted.

---

[12] Although the Second Circuit has never addressed the issue, there is a circuit split regarding whether this factor should encompass both arrests and convictions, *see United States v. Wilson*, 149 F.3d 610, 613 (7th Cir. 1998), or whether it should apply only to convictions, *see United States v. Juvenile LWO*, 160 F.3d 1179, 1183 (8th Cir. 1998). The Tenth Circuit has acknowledged the split but has declined to reach the issue, finding instead that even if this factor were limited to prior convictions, a juvenile's additional conduct would be relevant to other factors in the transfer analysis. *See United States v. Anthony Y.*, 172 F.3d 1249, 1253-54 (10th Cir. 1999) ("Even if we limited Anthony Y.'s prior delinquency to the three adjudicated offenses, the additional conduct considered by the district court was relevant to several of the other statutory factors, like 'the age and social background of the juvenile,' 'the juvenile's present intellectual development and psychological maturity,' or 'the nature of past treatment efforts and the juvenile's response to such efforts.' [T]he plain language of those terms is broad enough to authorize the admission of evidence regarding almost any action, criminal or otherwise, the juvenile has taken, as long as it is relevant." (additional quotation

Since the defendant joined MS-13 at the age of thirteen, he has been arrested and convicted for two serious offenses (separate and apart from the double homicide he is alleged to have participated in here). First, in or about 2008, the defendant was convicted in connection with a robbery and assault and was adjudicated as a juvenile delinquent. (*See* Gov't Ex. 16 at 56-57 (Nassau County Family Court records indicating that the defendant had a prior Office of Children and Family Services placement for robbery and assault).) Although the record does not reveal the details surrounding this offense, the defendant concedes that he was convicted of a misdemeanor and that this offense was related to his "association" with MS-13. (*See* Def.'s Closing Argument at 3-4.) The defendant also admitted to Dr. Hegarty that he spent most of 2008 in a juvenile detention facility in connection with this conviction. (*See* Hegarty Report at 2.)

Upon his release from custody, the defendant "was drawn back into the

---

marks and internal citations omitted)); *cf. A.R.*, 203 F.3d at 962 n.2 (citing *Anthony Y.* and noting "[w]e need not resolve this question since the district court did not place greater weight on this factor relative to others"); *Doe #1*, 74 F. Supp. 2d at 316 n.5 (noting split and stating that "the Second Circuit has given its implicit support to the notion that a juvenile's previous arrests may be relevant to the 'prior juvenile record' factor"). *But see In re Sealed Case*, 89 F.2d 363, 369 n.12 (D.C. Cir. 1990) (stating that a "juvenile's alleged violations of law" are "entirely unrelated" to other factors in the transfer analysis). In any event, this Court need not resolve this question because there is no dispute that the defendant has been convicted for each of the offenses relied upon by the Court in relation to this factor and the Court is not considering any conduct that related solely to an arrest.

gang. . . . [and] was remanded to [a juvenile detention facility] for much of 2009." (*Id.* at 2.) Specifically, on May 15, 2009, the defendant was observed by the police at 2:30 in the afternoon with a twenty-four inch black machete in his hand, raised above his shoulder, running toward a group of students who were fighting. (*See* Gov't Ex. 16 at 50; Gov't Ex. 18.) Although the defendant now denies, upon information and belief, that the incident was related to gang activity, the Nassau County Police Department Case Report reveals that the incident was recorded as a gang-related incident and that the defendant admitted to being a member of MS-13. (*Compare* Def.'s Closing Argument at 3 *with* Gov't Ex. 18.) The information in the police report is consistent with Dr. Hegarty's report that the defendant was "drawn back into the gang" after his release from his first incarceration and was then remanded to juvenile custody for possession of a weapon. (Hegarty Report at 2.) Dr. Hegarty also testified that the defendant's own account of the incident, as described to Dr. Hegarty, was, in sum and substance, the same as alleged by the government. (Tr. at 113:10-19.) In fact, Dr. Hegarty noted that the defendant's truthfulness about this incident "enhanced the reliability of the report." (*Id.* at 113:18-19.) Accordingly, the record supports the government's assertion that the defendant's second conviction was, in fact, gang-related. In any event, even if the conviction were not tied to MS-13 activity, it is undisputed that the defendant was convicted of a misdemeanor for possession of a weapon and that he was in custody from on or about the date of his arrest in May 2009 until December 22, 2009. (*See* Def.'s Closing Argument at 3; Gov't Ex. 16 at 36-42, 56-61; Gov't Closing Argument at 12; Hegarty Report at 10.)

As this record indicates, for the past several years, the defendant has been in-and-out of juvenile detention facilities and has continued to engage in criminal activity that was tied, at least in part, to his membership in MS-13. Moreover, although the defendant pled guilty only to misdemeanors, the record indicates that both convictions stemmed from serious conduct, including possession of a two-foot long machete. Indeed, Dr. Hegarty acknowledged that "without proper treatment, if [the defendant] returns to the gang and is to be influenced by the gang, those prior incarcerations would not bode well at all. They would bode ill for the future." (Tr. at 83:11-14.) Given the defendant's prior record of recidivism, the Court finds that this factor strongly weighs in favor of transfer. *See United States v. Juvenile No. 1*, 118 F.3d 298, 309 (5th Cir. 1997) ("In addition to his numerous runaways, J.R.P. was charged in 1993 with theft of under $200 and in 1995 with theft of over $1500. On March 21, 1996, J.R.P. pled guilty to adult charges in state court of engaging in organized criminal activity. This evidence was sufficient to support the court's conclusion that this factor weighs in favor of transfer. The evidence indicates, as the court found, that J.R.P.'s delinquency record 'demonstrates a pattern of continuous lack of respect for authority. Although most of his prior offenses are non-violent runway [sic] charges, it indicates that his criminal activity is not an isolated event, but has continued despite prior corrective and rehabilitative effort in state court.'"); *Doe #1*, 74 F. Supp. 2d at 321 ("[T]he court is particularly concerned with the seriousness of the crimes alleged, and the recidivist behavior exhibited by defendant. . . . Of paramount concern to the court is John Doe's demonstrated tendency to revert to criminal behavior.").

### D. Juvenile's Present Psychological Maturity and Intellectual Development

At the transfer hearing, the Court heard testimony from Dr. William Barr ("Dr. Barr"), a clinical neuropsychologist, and Dr. Hegarty, a forensic neuropsychologist, both of whom prepared evaluations and reports on behalf of the defendant. Dr. Barr testified first and explained that he had conducted a neuropsychological evaluation of the defendant, during which he had administered a number of standardized tests designed to assess intellectual functioning, attention, concentration, memory, and executive functioning. (Tr. at 16:12-17.) As to the defendant's intellectual functioning, Dr. Barr found that defendant's school records indicated that "at one point he was a very good student." (*Id.* at 20:25-21:1.) However, the defendant's scores on the tests of intellectual functioning were "well below what [Dr. Barr] would have expected based on his school results alone" and were "well below the level he should be for his age group." (*Id.* at 21:2-8.) Overall, Dr. Barr found that the defendant's intellectual development stopped at the fifteen-year-old level, around the time when the defendant "stopped valuing school, attending school, and benefiting from a school environment." (*Id.* at 27:15-21.) In other words, Dr. Barr opined that the defendant's current stage of intellectual development was tied directly to the defendant's environment and personal choices:

> Well, his scores on tests were lower than expected for his age group, and a few things were happening there. He demonstrated earlier in his life he could score quite highly on various subjects, like reading comprehension and other things. I think that is when he was in the confines of the school system, attending school, focused by his teachers, and to some degree by his family at that point. He scored very well. At some point when he essentially took a turn and got involved with other activities in his life, other goals in his life, he essentially left that behind, and in a sense his intellectual or cognitive development was essentially stopped at that point.

(*Id.* at 27:1-14.) Similarly, Dr. Hegarty testified that the defendant's intellectual development was "environmental-dependent," meaning that when he is in a more stable environment with at least some intellectual stimulation, such as the Allen Center, "his IQ is higher than it is today," but that when he is removed from intellectual stimulation, his intellectual functioning does not develop further. (*Id.* at 84:25-85:7.)

Dr. Barr also diagnosed the defendant with Attention Deficit Hyperactivity Disorder ("ADHD"), a condition that is characterized by hyperactivity and impulsivity. (*Id.* at 21:12-23:11.) Accordingly, Dr. Barr found that the defendant's ability to control his impulses was even more impaired than that of a typical adolescent. (*Id.* at 25:21-26:14.) Because of the weaknesses that the defendant exhibited in his cognitive control systems, Dr. Barr concluded that the defendant's cognitive development was equivalent to that of a fourteen or fifteen year old. (*Id.* at 30:16-22.)

However, Dr. Barr also noted that the defendant's self-reporting of executive dysfunction was higher than the dysfunction the defendant exhibited on the objective tests. (*Id.* at 52:21-23.) In other words, the defendant reported "more dramatic symptoms than . . . [those] typically hear[d]

from adults in the same setting." (*Id.* at 52:11-14.) Dr. Barr also expressed no opinion regarding whether a rehabilitative, juvenile sentence would prevent the defendant from committing future crimes. (*Id.* at 56:24-57:3.) Moreover, Dr. Hegarty stressed in her testimony that it was clear the defendant was of "normal intelligence" and that the defendant's "problems aren't with his intellect; they are with the systems in his brain that control[] his behavior . . . and also with his emotional development and the development of a stable sense of self or stable personality." (*Id.* at 79:13-20.) Dr. Hegarty also noted that the defendant's IQ was in the low average to average range,[13] which Dr. Hegarty found "extraordinary . . . given his environment[]." (*Id.* at 87:16-19.) Indeed, the defendant's ability to learn a second language and earn his GED, both under difficult circumstances, highlights the defendant's intelligence. (*Id.* at 87:20-88:3.)

As to the defendant's psychological maturity, Dr. Hegarty and Dr. Barr concurred that the defendant was "very immature for his age as a result of development . . . [and his] attention deficit hyperactivity disorder." (*Id.* at 74:16-18.) Both doctors were also "struck by . . . how changeable his personality is . . . [and] [h]ow vulnerable to peer influence he is." (*Id.* at 74:18-21.) Dr. Hegarty explained that the defendant was susceptible to environmental influences and was "somewhat vulnerable to suggestion." (*Id.* at 79:6-10, 82:20-83:22.) As such, "when he's in the wrong company, he does the wrong things." (*Id.* at 82:20-21.) However, Dr. Hegarty noted that the defendant's vulnerability to peer influence could work in the defendant's favor *if* his environment changed and he surrounded himself with positive peers and role models rather than the gang. (*Id.* at 86:11-21, 88:4-8.) Accordingly, Dr. Hegarty stressed that the "three key factors" for rehabilitation of the defendant are "number one, being away from gangs; number two, a male role model that he can have a relationship with over time; and, number three, sustained, consistent treatment of his symptoms and other problems." (*Id.* at 74:23-75:2.) Significantly, Dr. Hegarty also found that the defendant's environmental susceptibility was "of some concern" as it related to treatment and led her to conclude that because the defendant is "so environmentally dependent . . . somebody needs to be in charge of his care and treatment." (*Id.* at 81:12-18.) Dr. Hegarty concluded that the defendant would be amenable to treatment, but, again, this conclusion hinged on the defendant living "in a structured setting, removed from a gang, with appropriate treatment over time." (*Id.* at 90:16-19; *see also id.* at 83:11-22 ("So without proper treatment, if he returns to the gang and is to be influenced by the gang, those prior incarcerations would not bode well at all. They would bode ill for the future. It would likely make the three dots

---

[13] Regarding the defendant's IQ score, Dr. Barr noted in his report:

> According to a reading-based index that provides an estimate of intellectual abilities, [the defendant] should be performing in the 'average' range or above on standardized tests of intellectual functioning. His level of performance on [the intelligence scale] was somewhat below expectations with a resulting score in the 'Low Average' range . . . . [The defendant's] processing speed was significantly lower, as it fell in the 'borderline' range.

(Barr Report at 7.) Dr. Barr also noted that the defendant's reading skills were at the thirteenth grade level, and that his math and written language skills were at the eighth and ninth grade levels, respectively. (*Id.* at 6.)

on his hand come [true], end up in a hospital, prison or morgue. On the other hand, if you take him away from that environment and give him proper treatment, those earlier instances which also show us in the proper environment he does well might not . . . darken the clouds as we might fear.").)

The Court finds that, on balance, there are elements of the defendant's intellectual development and psychological maturity that weigh both for and against transfer, and, accordingly, the Court concludes that this factor is neutral in the transfer analysis.[14] On the one hand, the defendant's cognitive functioning, which has been impaired by his untreated ADHD, was below that of his peers and placed the defendant in the fourteen- to fifteen-year-old level of functioning. Moreover, as explained by Dr. Hegarty, the defendant is psychologically immature, with an unstable adolescent personality, impaired problem-solving skills, and an extreme vulnerability to peer influence. (Tr. at 88:18-24.) On the other hand, despite deficits in his cognitive functioning, the defendant nevertheless is an

individual of low-average to average intelligence, as reflected in his IQ test scores. Moreover, he has demonstrated his intelligence through his ability to perform well in middle school, to earn a GED, and to learn two languages. (*See, e.g.*, *id.* at 50:18-20 ("His performance on academic achievement tests as part of his educational record are higher than the scores obtained on [Dr. Barr's] tests.").) Indeed, Dr. Hegarty testified that the defendant was clearly of "normal intelligence." (*Id.* at 79:15.) Additionally, the defendant's intellectual functioning has been impaired not merely by circumstances beyond his control, but also by his *own* choices, namely, his decisions to stop trying in school and to surround himself with fellow gang members. As described *supra*, both doctors noted that the defendant's intellectual abilities seemed to ebb and flow depending on the environment he places himself in, thus indicating that some of the defendant's cognitive deficits may, in fact, be of his causing.

Furthermore, Dr. Hegarty's conclusion that the defendant would be amenable to treatment hinged directly on placing the defendant in a structured setting and removing the defendant from his gang. However, as described in subsection A, *supra*, there is no evidence whatsoever that the defendant is ready to give up his gang affiliation. Even Dr. Hegarty acknowledged that the defendant's identification with the gang remains "fairly strong," that the defendant exhibited only "small flickers" of questions about his gang membership, and that the defendant has no "major thoughts" to indicate that he regrets being in the gang. (*Id.* at 84:6-84:21.) Likewise, for the reasons already discussed *supra*, there is no setting in the defendant's life that would provide the structure and support necessary for him to engage in sustained and consistent rehabilitation, nor is there anyone

---

[14] Even assuming *arguendo* that this factor weighed against transfer, the Court would still conclude that transfer is warranted based upon a balancing of the other factors, for the other reasons set forth herein. *See, e.g.*, *Doe #3*, 113 F. Supp. 2d at 609 (granting transfer motion even where defendant's social background, his present intellectual development, and the availability of treatment programs weighed against transfer, and defendant's psychological maturity was a neutral factor); *Doe #1*, 74 F. Supp. 2d at 320-21 (transferring case even though defendant's social background, his present intellectual development and psychological maturity, his response to past treatment efforts, and the availability of treatment programs all weighed against transfer).

to supervise the defendant's treatment efforts, a factor that Dr. Hegarty said was "of some concern" given the defendant's vulnerability to environmental influences. Indeed, although Dr. Hegarty stressed the importance of finding a positive role model for the defendant, there is no indication in the record that there is any such adult in the defendant's life. Finally, Dr. Hegarty's conclusion that the defendant would do well if placed in a structured setting appeared, in part, to be based upon the fact that the defendant did "well" at the Allen Center, where she testified that he "has only one fight that is documented in the record. . . . [and] [h]e gets his GED." (*Id.* at 76:7-9.) However, as the government highlighted on cross-examination, the defendant had disciplinary infractions at the Allen Center that went beyond the "one fight" referenced by Dr. Hegarty. For example, the defendant threatened one of his teachers, warning that "something bad" was going to happen to her, and, in a separate incident, threatened to "come back and blow this place up." (Gov't Ex. 8 at 98, 121.) These threatening comments weigh against a conclusion that the defendant necessarily will do well merely through placement in a structured setting.

Based on this record, with respect to this particular factor, the Court does not find that any one of the pieces of evidence discussed herein should outweigh the others. Accordingly, because there are elements of defendant's intelligence and maturity that weigh both for and against transfer, the Court concludes that this factor should be neutral in the Court's transfer analysis. *See Juvenile Male*, 554 F.3d at 469 ("[T]he district court found that CAM's intellectual development and psychological maturity constituted a neutral factor. Two psychiatric evaluations show CAM to be in the 'low-average range' of intellectual development.

CAM's intellectual development at school was hampered by the fact that English is his second language and his parents have limited education. His abuse of drugs demonstrated a low psychological maturity, but such abuse is offset by the responsibility he accepted at home. Although some of CAM's conduct indicated immaturity, the court recognized that he had shown glimpses of maturity. In such circumstances, the court's decision to treat this factor as neutral was not clearly erroneous."); *A.R.*, 203 F.3d at 962 ("[C]ourts have generally concluded that lower maturity and intelligence do not negate a transfer finding as long as a defendant has the cognitive ability to conform his conduct to the law.").

E. Juvenile's Response to Past Treatment Efforts and the Nature of Those Efforts

The records submitted by the government at the transfer hearing indicate that, while incarcerated at the Allen Residential Center, the defendant was exposed to behavior modification programs and transitional programs, including "Work Plus, Innervisions Drug Curriculum, Life Skills, Beat the Street and Victim Awareness." (Gov't Ex. 16 at 26-27.) The defendant also participated in weekly individual counseling sessions with a youth counselor, with whom the defendant would discuss, *inter alia*, his "progress or lack of progress, the goals he is working towards, including family issues, peer issues, past criminal behaviors and changes he will have to make prior to his release back to the community." (*Id.* at 27.) Furthermore, the defendant also was exposed to a variety of group counseling programs, including "Conflict Resolution, Structured Learning Techniques, . . . . [and] [l]ife skills groups . . . aimed at helping him improve his self image, decision making, communication skills, [and] relationships." (*Id.*) The

government also submitted logs from several of the defendant's individual counseling sessions that reflect the content of what the defendant and his counselor discussed during these sessions. (Gov't Ex. 8 at 161-64.)

The defendant's experts, however, stressed that the Allen Center records did not indicate that the defendant had received individualized treatment that was targeted at treating his ADHD. For example, Dr. Barr noted that he only saw evidence in the records of group treatments, and that he did not see any indication that the defendant received effective one-on-one treatment. (Tr. at 42:21-23.) Likewise, Dr. Hegarty noted that the defendant received "generic treatment" in the form of group counseling, but did not receive "the definitive treatment, which was medication and counseling, around attention deficit disorder." (*Id.* at 72:4-8.) These groups, in Dr. Hegarty's opinion, were more "psychoeducational" then therapeutic in nature. (*Id.* at 104:22-106:6.) However, Dr. Hegarty did acknowledge that while at the Allen Center, the defendant did receive "a good diagnostic workup and treatment." (*Id.* at 71:16-17.)

In any event, even if the defendant has not received individualized treatment specifically aimed at his ADHD symptoms, the Court concludes that this factor weighs strongly in favor of transfer. First, it is undisputed that the defendant did participate in at least generalized group therapy and was exposed to a variety of behavior modification programs. However, these programs appear to have had no impact on the defendant's behavior, given that he is alleged to have participated in the murders charged here a mere six weeks after his release from the Allen Center. Moreover, the defendant's disciplinary problems at the Allen Center also demonstrate that he failed to respond to the treatment opportunities provided to him. For example, on one occasion, the defendant threatened a teacher at the Allen Center, warning "something bad is going to happen to you." (Gov't Ex. 8 at 98.) In another incident, the defendant threatened to return to the facility upon his release and blow it up. (*Id.* at 121.) These plainly are not the remarks of a juvenile who is responding well to treatment or to his placement in a juvenile facility.

In addition, even if the defendant were to receive treatment specifically geared toward his ADHD, the Court has serious doubts that treatment for mere hyperactivity and attention deficits could sufficiently rehabilitate the defendant such that he could be released into society in only a few short years, particularly given the heinous and callous nature of the crimes alleged here. In other words, the seriousness of the offense charged in this case indicates such a heightened level of dysfunction and depravity that the Court finds that it is highly unlikely that the defendant, if convicted, would respond to rehabilitative efforts before he reached the age of twenty-one, even if such efforts were tailored to treat his ADHD. Significantly, the Court's conclusion is underscored by Dr. Hegarty's own testimony. In particular, when asked by the Court to assume, in assessing the likelihood that the defendant could be rehabilitated by the age of twenty-one, that the defendant had participated in the alleged double homicide, Dr. Hegarty initially indicated, "I would really need to talk to him at some length to really answer this properly for you," but then quickly concluded, "I think there is still—it's more likely than not that he could recover, assuming you can really keep him away from the gang." (*Id.* at 132:20-24.) Significantly, Dr. Hegarty then added, "[h]owever, there's no question, your Honor, if I assumed that he actually

perpetrated these acts of violence, it's hard." (*Id.* at 132:25-133:2.) Regarding Dr. Hegarty's response, the Court first notes that the doctor's assumption that the defendant could be kept away from the gang is an unrealistic one, given his extremely strong membership and identification with the gang throughout his childhood, his failed past efforts to respond to rehabilitation, and the complete absence of any stable relationship in his family or society at large.[15] Second, when the Court asked Dr. Hegarty to support her conclusions with any empirical evidence that someone convicted of the type of criminal activity alleged here had been quickly rehabilitated by the age of twenty-one, Dr. Hegarty responded, "No, I don't. And the concern is warranted." (*Id.* at 133:13-20.) Finally, Dr. Hegarty's overall conclusion, when assuming that the defendant had participated in the double homicide, was that "given the immaturity, there is still a chance assuming that he did

do it, that he could recover by the age of 21. What happens afterwards is important though." (*Id.* at 133:9-12.) However, a "chance" that the defendant may be rehabilitated by the age of twenty-one does not justify treating him as a juvenile, especially where the other factors clearly demonstrate, on balance, that rehabilitation by the age of twenty-one is, at best, remote in the extreme.[16] Accordingly, the Court finds that this factor weighs strongly in favor of transfer.[17] *See Doe #1*, 74 F. Supp. 2d at 321 ("Of paramount concern to the court is John Doe's demonstrated tendency to revert to criminal behavior. . . . As rehabilitation is the primary purpose of the federal delinquency provisions, including § 5032, and the government has demonstrated by a preponderance of the evidence that rehabilitation is not likely in this case, the court finds that transfer of John Doe to adult status is warranted.").

---

[15] In fact, given how unrealistic this assumption was, the Court asked Dr. Hegarty what her conclusions would be if she were to assume that there was no structured and stable environment for the defendant to be released into at the age of twenty-one. In her response, Dr. Hegarty explained:

> That depends on how he was then. There are factors to suggest that it might be okay. There are factors in this case. The intelligence, his ability to, you know, stick with the program and of course the longer it goes on, the better. Often the downside of this, the factors to suggest it was not okay to be released at 21, the fact there is violence here in this history and psychological trauma also shades that, influences that. So looking at this young man, I think this defendant has a good chance of being okay, but it is absolutely not open and shut.

(Tr. at 134:1-11.)

---

[16] The Court notes that, during the above-described exchange between the Court and Dr. Hegarty, Dr. Hegarty's demeanor changed from the other part of her testimony, she struggled to answer the questions in a manner favorable to the defendant, and she became less confident of her conclusions and assessments.

[17] The Court notes that, even assuming that the defendant had turned eighteen by the time of any conviction and sentence as a juvenile on the crimes charged here and, thus, was eligible for a maximum sentence of up to five years' imprisonment (rather than simply to age twenty-one), *see* 18 U.S.C. § 5032(c)(2), the Court's analysis and findings would be exactly the same. In other words, the Court concludes, based on the current record, that the defendant is no more likely to be rehabilitated in five years if convicted of the crimes charged here than by age twenty-one.

## F. Available Programs That Are Designed to Treat the Juvenile's Behavior Problems

The government asserts that, according to the Northeast Regional Office of the Bureau of Prisons, there are no federal facilities for individuals adjudicated as juvenile delinquents. (Gov't Mem. of Law at 26.) Instead, such individuals from this district would be sent to state contract facilities for juveniles in either Pennsylvania or Maine. (*Id.*) No such facilities would be available in New York State for individuals of the defendant's age. (*Id.*) The government also stated in its post-hearing submission that the defendant would be ineligible for many juvenile treatment programs given the fact that he is almost eighteen years old. (Gov't Closing Argument at 3, n.3.)

Nevertheless, the government acknowledges that it has not met its burden of proof in demonstrating the absence of suitable, available programs. (*Id.*) As noted by the Second Circuit, the government must "do more than merely assert the unavailability of an appropriate program." *Nelson I*, 68 F.3d at 591. Instead, "[i]t must make a showing that it has investigated various options but is still unable to find a suitable and available program." *Id.* In this case, there is at least some indication that state juvenile facilities in either Pennsylvania or Maine might be able to house the defendant. Defense counsel also noted several facilities and programs for which the defendant would still be eligible. (Def.'s Mem. of Law at 5-6.) Thus, the Court finds that this factor weighs against transfer, but does not outweigh the other factors which, in combination, overwhelmingly favor transfer. *See Doe #3*, 113 F. Supp. 2d at 609 (finding factor weighed against transfer where "the government did no more than merely assert

the unavailability of an appropriate juvenile rehabilitative program for the defendant" and therefore "failed to carry its burden of persuading the court that no such programs exist" (internal quotation marks, alterations, and citation omitted)).

\* \* \*

In sum, after carefully balancing all of the statutory factors based upon the record as set forth herein, the Court concludes that transfer of the defendant to adult status is warranted in this case in the interest of justice. As an initial matter, the defendant is charged with the heinous double homicide of a mother and her young son—the Court finds that this is precisely the type of serious and heinous crime that overwhelmingly weighs in favor of transfer. Moreover, a review of the factors demonstrates that the defendant is not likely to respond to rehabilitative efforts. For example, as described in detail *supra*, the defendant failed to respond to prior rehabilitative efforts—he threatened staff members at the juvenile facility where he was housed and he allegedly committed the double homicide charged here only six weeks after his release. Furthermore, the fact that the defendant is nearly eighteen years old, considered in conjunction with the other factors, also strongly suggests that he is not likely to respond to juvenile-type rehabilitation programs. *See Nelson I*, 68 F.3d at 589 ("[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application. Indeed, the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks and citations omitted)); *J. Anthony G.*, 690 F. Supp. at 766 ("The sorts of benefits that the federal Juvenile Justice Act was intended to

provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21."). Finally, the Court concludes that the defendant's long-term affiliation with MS-13 and his continued alliance to his gang—as demonstrated most recently by, *inter alia*, the fact that he tattooed his gang's letters on his chin—make it highly unlikely that the defendant would respond to juvenile-type treatment efforts, particularly because successful rehabilitation for the defendant would hinge, according to Dr. Hegarty, on the defendant disassociating himself from his gang. Accordingly, the Court finds that the defendant's rehabilitation potential is low.

The Second Circuit has made clear that "while rehabilitation is a priority, the courts are not required to apply the juvenile justice system to a juvenile's diagnosed intellectual or behavioral problems when it would likely prove to be anything more than a futile gesture." *Nelson I*, 68 F.3d at 590 (internal quotation marks and citation omitted). In addition, "the goal of rehabilitation must be balanced against the threat to society posed by juvenile crime." *Nelson II*, 90 F.3d at 640 (internal quotation marks and citation omitted). Accordingly, given that the crimes charged here involve the "heinous . . . crime of intentional murder," *Nelson I*, 68 F.3d at 590, and given that the record demonstrates that the defendant is unlikely to be rehabilitated in the juvenile system, the Court concludes that the government has overwhelmingly met its burden of showing that transfer is warranted in this case. Thus, the government's motion to transfer the defendant to adult status is granted.

### IV. CONCLUSION

For the reasons set forth above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of the defendant to adult status is in the interest of justice. Accordingly, the government's motion to transfer the defendant to district court for prosecution as an adult is granted.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: January 26, 2011
        Central Islip, New York

* * *

The United States is represented by Loretta E. Lynch, U.S. Attorney, Eastern District of New York, 610 Federal Plaza, Central Islip, New York 11722 by John J. Durham, Assistant U.S. Attorney. Defendant Juvenile Male #2 is represented by Francis P. Murphy, Esq., 32 Bohak Court, Sayville, NY 11782.